BULL et al. v. UNITED STATES SHIPPING CO. et al.

(Circuit Court of Appeals, Second Circuit. July 23, 1909.)

No. 286.

SHIPPING (§ 175*)—DEMURRAGE—LIABILITY OF CHARTERER.

The steamship Eva was chartered to carry a cargo of coal to be loaded at Philadelphia; the charter party providing for "customary steamer dispatch loading, steamer to take turn with other steamers loading coal." By the rules of the Greenwich coal pier, where she was to load, each vessel was required to register when ready to load, and was loaded in turn, unless she failed to dock when her bearth was ready, in which case she lost her place and must re-register. The Eva registered, and her master was told by the charterer's agent that she could not be loaded for about a week. She then went to a shipyard to have some changes made in her bulkheads, which, however, were not necessary for her coal cargo, and could be suspended at any time on notice, and she could have reached the coal dock within an hour. When her turn for loading was reached, she was not notified; but another vessel was given her place apparently at the instance of the charterer, and she was delayed for several days. *Held*

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that, after registering, she was not required to remain anchored near the docks, but was within her rights in utilizing the time while waiting for repairs, and was entitled to reasonable notice when her turn to load came, and that the charterer was liable for demurrage for the time she was delayed.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 572–574; Dec. Dig. § 175.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Action by Archibald H. Bull and others, as owners of the steamship Eva, against the United States Shipping Company, the Berwind-White Coal Mining Company, and others, for demurrage. Decree for respondents, and libelants appeal. Reversed.

A decree of the District Court for the Southern District of New York dismissed the libel in an action of demurrage for the detention of the steamship Eva at Philadelphia beyond the time limit stipulated in the charter-party. The action was originally brought against the charterer, the United States Shipping Company, which on petition, under the fifty-ninth rule, brought in, as a party respondent, the Berwind-White Coal Mining Company, which latter company held a subcharter in terms substantially identical with the original.

MacFarland, Taylor & Costello and Willard U. Taylor, for appellants.

Wing, Putnam & Burlingham and Henry E. Matteson, for appellee United States Shipping Co.

Wilcox & Green and Herbert Green, for appellee Berwind-White Coal Mining Co.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. Both charters contain the following:

"It is agreed that the lay days for loading and discharging shall be as follows, if not sooner dispatched commencing from the time that the captain reports his steamer ready to receive or discharge cargo, and custom house formalities are fulfilled: Customary steamer dispatch loading, steamer to take turn with other steamers loading coal, and the cargo to be taken from alongside by consignees at the port of discharge, free of expense and risk to the steamer, at the average rate of not less than three hundred (300) tons per running day (Sundays and holidays excepted), providing the steamer can deliver it at this rate. Also, that for each and every day's detention by default of said party of second part, or agent, ten cents U. S. gold per net register ton per day, day by day, shall be paid by said merchants, or agent, to said chartered owners or agents."

Pursuant to the written directions of the original charterer, dated October 29, 1907, the Eva proceeded to Philadelphia, arriving there November 1, 1907. Her master reported to the Berwind-White Coal Company as follows:

"I beg to notify you that the S. S. Eva is now in port and ready to receive her cargo and will come on her lay days forthwith.

"Respectfully yours, H. R. Swift, Master."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

He also registered the Eva pursuant to the local port rules which had been adopted two months previously. On this day, November 1st, Chase, the general manager of the Berwind-White Company, who received the notice of the master of the Eva, informed him that they would not be ready to load the ship for a week—"say next Thursday." Roney, a witness for the libelants, testified that he was present at this conversation between the master of the Eva and Chase, and that the—

"captain asked Mr. Chase when the cargo would be ready for his vessel and that Chase replied, 'The middle of next week.' Captain, as I remember, said that was rather indefinite and during the conversation Mr. Chase said 'by Thursday' or 'not before Thursday.'"

In the Berwind-White letter of November 9th to Mr. Rossen it is stated that the master of the Eva was informed that "it would be four or five days before the Eva could take berth." That this assurance was given is also admitted, in its essential particulars, by Chase who testifies as follows:

"He (the master) asked me at that time when I thought he would be loaded. I told him I could not tell exactly, there were some vessels there loading at that time, but it looked to me as though it would be next week. He said to me 'well, do you know when?' I said I suppose about the middle of the week."

The testimony shows that in view of the limited capacity for loading coal at Philadelphia it is seldom that a vessel receives quick dispatch. The Eva arrived about noon of November 1st and no loading berth was available until 5 o'clock of the afternoon of the 7th when the steamship Queen Adelaide, which took the Eva's place, was sent to the berth. It is manifest, therefore, that the master of the Eva was justified in assuming that his vessel was to lie idle for at least five and a half days—it was in fact nearly a full week.

Pursuant to the local custom of the port the master of the Eva registered her at 1:30 p. m. November 1st in the registry kept at the Greenwich coal pier. The rules requiring this to be done are as follows:

"1. All vessels must be registered by the proper officer in charge, in a book kept at the pier office for that purpose. Under no circumstances is a vessel entitled to register until ready to cargo. A vessel not registered will not be given a berth. * *. *

"4. If from any cause whatever a vessel which has registered fails to dock when berth for cargo is ready, such vessel when ready to cargo must again register as newly arrived and take its turn according to the latest registration."

On arriving at Philadelphia the Eva proceeded to the Cramp, or Kensington, shipyard, a distance variously estimated at from 2 to 4 miles from the Greenwich pier, and tied up at the dock where she was given free wharfage. She went to the Kensington yard to receive her stores and make some repairs. This yard was within the port of Philadelphia and from there the Eva could have reached the coal pier in from half an hour to an hour. The repairs which the owner of the Eva desired to make consisted in replacing about two-thirds of a wooden bulkhead with steel. This substitution in no way affected her utility or capacity as a coal carrier. The change was not structural in character and was designed to enable her to carry asphalt with greater facility. When she reached Philadelphia she was ready to load and could have gone at

once to her berth had one been available. The repairs on the bulkhead could have been suspended at any moment and she could have been at the Greenwich pier within four or five hours after receiving notice that the vessel then occupying the coaling berth was about ready to vacate. That she would have been ready on Thursday afternoon there can be no doubt. She was in fact ready. Although vessels awaiting their turn frequently lie off the Greenwich pier it is not necessary that they should do so and in this case Manager Chase expressly states that they would accept a vessel lying at the Kensington yard "if she was in all respects ready."

The respondents insist that because the Eva was utilizing the days she was compelled to be idle in having a bulkhead repaired, she was not "ready" and that they were justified in having her name stricken from the registry and the Adelaide put in her place with a consequent delay of 10 days. It is not necessary to decide whether the name of the Eva was actually removed from the list; that question is wholly negligible in view of the fact that through the combined action of the respondents and the pier master the Adelaide which was registered 3½ hours afterwards was given the Eva's place. The fact of preference being admitted the modus operandi by which the result was accomplished is unimportant. This preference can be justified only upon the theory that the Eva was not ready because, and solely because, she was having a bulkhead changed during her enforced idleness. That there would be a delay at Philadelphia was contemplated by both parties when the charters were made.

The simple question, then, is were the charterers justified in arbitrarily determining, without notice to, or consultation with, the ship owners, that the Eva was not ready because she was having repairs made during the time she was waiting for her turn? We are of the opinion that the question should be answered in the negative. We think the testimony is overwhelmingly to the effect that when the Eva reached Philadelphia she was ready to receive cargo and would have gone directly to her berth had one been empty. She did not then begin to load because the berths were all occupied and proceeded to Cramp's shipyard relying on the statement of the charterer's agent that she could not be loaded until about Thursday of the following week. We think that the repairs which were being made could at any time have been discontinued and the Eva berthed upon receiving reasonable notice. That she was "ready" even upon the respondents' interpretation of that term, before a berth was vacant is proved beyond controversy. She was, indeed, ready on November 6th and could have come down from Kensington in an hour.

The respondents seem to proceed upon the theory that the Eva's position was analogous to that of a ticket purchaser before a box-office, or an apprehensive depositor awaiting his turn to reach the teller's window in a suspected bank, who forfeits his place if he drops out of line. Such a contention leads to the conclusion that a vessel loading at the Greenwich pier must lie on the anchorage ground opposite with bunker coal on board and hatches swept out, and if she fails in these respects she is liable to be stricken from the list by an invisible hand guided by any hostile interest. We do not so understand the situation.

The registration of vessels was intended as a substitute for waiting in line. Once properly on the list it is no affair of the pier master, or the charterer, what the vessel does so long as she remains in port. The test of readiness is her ability to reach the loading berth in time. If she fails the loss is hers, and the gain that of the vessels below her on the list.

Rule 4, quoted above, contemplates exactly this penalty and no other. If the registered vessel fails to dock when the berth for cargo is ready then, and then only, must she re-register. The rule does not say that if she utilizes the time she is compelled to wait by cleaning, or painting, or making changes in her bulkheads she may be sent to the bottom of the list by the machinations of hostile interests. Any interpretation of the rule which gives to an individual the arbitrary power of determining by an ex parte examination the condition of readiness must inevitably lead to favoritism and fraud.

Of course, a vessel once registered, must for her own protection, keep watch of the conditions at the loading berth, but any miscalculation is at her own risk. If she fails to respond when summoned she loses her turn, but no one else has a right to assume in advance that she will lose her turn. Even in a case where the repairs are so extensive that the presumption is strong that the vessel will not be ready there is no occasion for judging the situation in advance. As we construe the rule it works automatically, when a berth is vacated the next vessel on the list is summoned, and if she does not appear the next is called, and so on. We have no doubt that the refusal to give the Eva her turn at the loading berth was an arbitrary act without justification in fact or law.

Who is responsible? The respondents argue that the pier master is alone to blame. He was not called as a witness. It is not easy to discover any personal motive on his part for discriminating against the Eva. Whatever action he took must have been at the instigation of some interested party. To hold the pier master solely in fault for the Eva's detention would leave her remediless and would probably do an injustice to that official. The testimony on this branch of the case is far from satisfactory, but, such as it is, it points directly to the subcharterer as the responsible party. The master of the Eva testified that the pier master told him that he received his instructions to strike the Eva's name off the registration list from the shipper. Chase, the general manager for the shipper, testified that he knew of the repairs at the shipyard on November 2d and talked with the pier master on that day regarding the matter, but did not notify the master of the Eva that there was any question as to his status at the loading berth until Wednesday the 6th when he informed him that the Eva was not ready to receive cargo and her name had been taken off the list.

We cannot believe that the pier master without persuasion from some controlling source would have assumed the responsibility for such a highhanded and illegal proceeding. It is at least a fair presumption that the pier master received his information of the Eva's repairs from the manager of the Berwind-White Company, and that it was through its influence that the Eva lost her turn. If the libelants had been informed on November 2d that there was any question regard-

ing the Eva's right to retain her place it is probable that she would have abandoned the repairs if the matter could not have been arranged. But with full knowledge of the facts it seems inconceivable that the pier master would have insisted upon maintaining so indefensible a position. The shipper was, in a sense, the vessel's agent, he entered and cleared her at Philadelphia; if he did not actually connive at the unlawful preference given the Adelaide he remained silent when knowledge of the situation by the master of the Eva would, in all probability, have enabled him to explain the circumstances in time.

Counsel for the Berwind-White Company contend that the Eva's name was not stricken from the list. They say:

"The pier master simply treated the ship as not registered when he found she was repairing at the shipyard."

If counsel be correct, and the testimony seems to sustain their contention, there was nothing on the registry to indicate how the pier official was treating the Eva. Her master was a stranger, entirely ignorant of the local usages, and yet it is contended that the rights of his owners are to be destroyed because of a conclusion which the pier master had reached in his own mind but had failed to impart to the master either orally or in writing or by removing the Eva's name from the list. In other words, if the pier master was under no obligation to notify the ship, either directly or indirectly, it follows that vessels destined for the Greenwich pier are wholly at the mercy of an irresponsible autocrat; their rights depending upon the unknown and unascertainable condition of his mind. It may be that the pier master thought he had given sufficient notice when he informed the Eva's representative at the port expecting, of course, that he would immediately notify the representatives of the ship.

The testimony of Capt. Swift, uncontradicted by the pier master, that the latter told him that he was instructed by the Berwind-White people to take the Eva's name from the registry, the failure of Manager Chase to notify the Eva of the pier master's proposed action and the absence of any testimony indicating that the action of the pier master was induced by others, lead us to the conclusion that the agents of the Berwind-White Company are responsible for the Eva's unlawful detention.

The decree is reversed with the costs of this court, and the cause is remanded to the District Court with instructions to enter a decree for the libelants and if necessary to order a reference to determine the amount due.

NOTE.—The following is the opinion of Adams, District Judge, in the court below:

ADAMS, District Judge. This action was brought by Archibald H. Bull and others against the United States Shipping Company to recover for damages suffered because of delay in loading the steamer Eva at Philadelphia in November, 1907. After some formal allegations it is stated that in the month of October, 1907, the Eva, being about to conclude a voyage, libelants' agents made and concluded with respondents a charter-party which was annexed and made a part of the libel, marked Exhibit A. That charter-party provided for the use of the vessel and for compensation and contained this clause: "It is agreed that the lay days for loading and discharging shall be as follows, if

not sooner dispatched: Commencing from the time that the Captain reports his steamer ready to receive or discharge cargo, and Custom House formalities are fulfilled; customary dispatch loading, steamer to take turn with other steamers loading coal, and the cargo to be taken from alongside by consignees at Port of Discharge * * * and every days' detention by default of the party of the second part, or agent, so much per registered ton per day."

The Shipping Company's answer to that is practically that a charter-party was made as alleged and that the respondents sub-chartered such steamer Eva to the Berwind-White Coal Mining Company, copy of which charter is also annexed.

I may say here that the charter to the Coal Company was practically a copy, as far as conditions were concerned, of the original charter.

When the vessel arrived here she started for Philadelphia and in going up the Delaware River she passed the dock where she was to be loaded, which I judge was known to the master of the vessel. In passing a point further up and convenient to the office of the Berwind-White Company the master left the vessel, while she went on to Cramp's Shipyard in order to carry out a contract which had been made for work to be done on her. There is considerable conflict here as to what work was to be done under the contract, the libelants contending it was simply putting in a bulkhead and had nothing to do with the vessel herself; while the other parties contend that although it was not a part of the structure of the vessel it should be regarded as repairs. I suppose, strictly speaking, it was not repairs. There was something done for the improvement of the vessel to be subsequently used if an opportunity should offer when such exigency should arise. But while this contract was in force and while the vessel was going to Cramp's Shipyard in Philadelphia the master left the vessel and went and reported her "Ready" and upon that report the vessel obtained a status at the pier, under certain laws that have been stated and according to certain regulations made by a director of the wharves, which has been marked in this case Berwind-White Company's Exhibit E. These rules and regulations if they did not state the law as passed by the Legislature were at any rate recognized by these people, and by others going to Philadelphia as entirely proper for the governing of a vessel in this situation. Rule 1 provides that all vessels must be registered by the proper officer in charge, in a book kept at the Pier Office for that purpose. This Pier Office is the office that was passed by the vessel when on her way to Cramp's Shipyard. It was on a Pier in the lower part of Philadelphia at Greenwich Point. She passed those piers and went to Cramp's which is stated to be, and I suppose correctly, at least four miles away, and while there she was under the substantial control for the time being of the Cramp's people who were adding this bulkhead to the vessel.

I do not think that the vessel could be considered ready to load at that time. The Captain of the vessel states that he had some sort of understanding before the vessel went to Philadelphia that she would not be required for cargo for some little time, and that he was acting on that understanding when he allowed his vessel to go to Cramp's Shipyard. But he himself went to report that the vessel was ready, when she was not actually ready within the provisions of the rule I have just read, which provides that under no circumstances is the vessel entitled to register until ready to take her cargo. The Captain did register when she was not ready to cargo. She had passed the place for cargo and had gone to Cramp's Shipyard for the purpose of having this bulkhead changed. There is a good deal of conflict of testimony, but I have no doubt that the vessel could have stopped that work in the course of two or three hours and proceeded to her loading place. Nevertheless, when the Captain made his report she was not ready. She was then going to a place where a certain number of men had to work on her—forty or fifty it turned out—whose tools were aboard the vessel and were being used in the work of the improvement in having this bulkhead put in her. It seems to me that by proceeding that way the master obtained a status that he was not entitled to. If he had stated to the people who had charge of that Pier that he was going to a Shipyard for the purpose of making alterations or improvements on the vessel and could complete them on a short notice, and if some arrangement had been made with the Pier by which he could receive such notice as the

situation demanded, that would be different. But he reported that she was "ready" and when the Pier people discovered that she was at Cramp's Shipyard, not ready, but proceeding to make these improvements, they evidently struck her name from the list. The fact that she was obliged to re-register, seems to have been in conformity with the rules and regulations, or law, whichever we are pleased to call it, which says that a vessel not registered, will not be given a berth; also, that vessels must take their turn in loading in the order of their arrival and registry at the Pier Office.

It appears that the Berwind-White Company had coal in cars in the vicinity of the loading pier all the time which could have been put aboard this vessel when she reached there. She had to have a berth and in order to get that berth she had to fulfil the conditions required by the rule. As I have said, she was not in such condition, and when they found that she was not they struck her name off the list, so that she could not get the coal and there was no opportunity for the Berwind-White Company to deliver the coal to her until she could get a berth. They had the coal there to deliver to her and it seems to me they performed their full obligation with respect to the vessel and that the reason she was not loaded was because, instead of going to the Pier herself or anchoring off the Pier or somewhere in the vicinity and keeping some watch over the proceedings there and herself in touch with the people at the Pier, she went off and went to a dock where she had free wharfage, where she was to take in stores to be sure, but also where the alterations were to be made. She did not go out of the water, but she was far away from the pier where she was to be loaded and not in touch with the people. She relied upon the Berwind-White people for information in respect to the Pier. They were agents of the vessel and of course it was their duty to communicate any thing they knew about the vessel, but they could not control that pier. It was a pier entirely under the control of the Pennsylvania Railroad and the Berwind-White people could do no more than seek to influence the authorities by permission with respect to berths.

It seems to me, therefore, that the master lost his opportunity by going some distance from the Pier and there engaging in the operation of making additions to his vessel which prevented his being immediately ready. She was not ready, and the registration which he obtained was upon a misrepresentation and when that was ascertained, the Pier people were justified in striking her name from the list.

Of course I do not mean to reflect upon the master of the Eva. He appeared to good advantage on the stand and evidently thought he was doing his duty. I think he misconceived his duty in allowing his vessel to go to another part of the city, and leaving it at a place which would be inconvenient as far as the loading berth was concerned, and that led to the whole misunderstanding. If he had at once stopped his vessel and gone to the Berwind-White Company's office and told them his boat was there and waiting for orders and the Berwind-White people had said, "It doesn't make any difference, you can go to your Pier," then I could see how some charge might be made against the Berwind-White Coal Company. But when he went to the Cramp Shipyard for the purpose of making those alterations, not advising anybody that he was going or how long he would be kept there it seems to me he was taking chances for the vessel which have turned against them in this transaction, because when he lost his place and registration, he lost his turn and a turn was not available until the vessel was reinstated, and it was under that reinstated turn she was finally loaded and the loss of time, meantime was suffered. I fail to see how either the Shipping Company or the Berwind-White Company can be held liable.

I therefore dismiss the libel and petition.